# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY LOUIS LAMON, | 1:09-cv-00514-OWW-SMS (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | [Doc. 1] |
| DERRAL G. ADAMS, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## RELEVANT HISTORY

Following a jury trial in the Kings County Superior Court, Petitioner was convicted of felony battery while confined in state prison upon a non-confined person (Cal. Pen. Code § 4501.2).[1]  The jury also found true that Petitioner served two prior prison terms (§ 667.5(b)) and had three prior "strike" convictions under California Three Strikes law (§§ 667(c)-(j), 1170.12(a)-(e))-a prior attempted murder conviction, a prior murder conviction, and a prior aggravated assault conviction.  (Lodged Doc. No. 9.)

Petitioner was sentenced to 25 years to life pursuant to the Three Strikes law, plus two years for the prior prison terms, totaling 27 years to life.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1   Petitioner filed a timely appeal.  On March 27, 2008, the California Court of Appeal,

2   Fifth Appellate District affirmed the conviction of the felony battery offense (§ 4501.5) and the

3   true finding on the prior attempted murder "strike" conviction.  The Court of Appeal reversed the

4   true finding of the prior aggravated assault due to insufficient evidence, and the prior murder

5   "strike" convictions because the record did not demonstrate that the jury's true finding was read

6   out loud in open court and acknowledged by the jury.  The case was remanded to the trial court

7   for retrial on the prior aggravated assault and murder "strike" convictions and/or resentencing.

8   (Lodged Doc. No. 1.)

9       Petitioner filed a petition for review in the California Supreme Court on May 6, 2008.

10   (Lodged Doc. No. 2.)  On that same date, the California Court of Appeal received from the

11   California Kings County Superior Court clerk 1) a declaration from the court report indicating

12   that the reporter's transcript of the verdict proceedings was incomplete, and 2) a corrected

13   reporter's transcript of the verdict proceedings.  (Lodged Doc. No. 3.)  In response, the Court of

14   Appeal sent a letter to the Supreme Court, requesting that the Court order review on its own

15   motion and transfer the matter back to the Court of Appeal for reconsideration of its decision in

16   light of the court reporter's declaration and corrected reporter's transcript.  (Lodged Doc. No. 4.)

17   On July 9, 2008, the California Supreme Court ordered review and transferred the matter

18   back to the Court of Appeal.  (Lodged Doc. No. 5.)

19   On August 7, 2008, the Court of Appeal directed the Superior Court to construe the court

20   reporter's declaration and the corrected reporter's transcript as a motion to correct the record, and

21   to conduct further proceedings to prepare a corrected record.  (Lodged Doc. No. 6.)

22   On September 9, 2008, the Superior Court held a hearing to correct the record of the

23   verdict proceedings.  (Lodged Doc. No. 7.)

24   The corrected record on appeal was filed with the Court of Appeal on September 24,

25   2008.  (Lodged Doc. No. 8.)

26   On January 12, 2009, the Court of Appeal, on reconsideration, affirmed the conviction of

27   the substantive offense (§ 4501.5) and the true findings on the prior murder and attempted

28   murder

2

1    "strike" convictions. (Lodged Doc. No. 9.) The Court of Appeal reversed the prior aggravated

2    assault because of insufficient evidence, and remanded the matter for retrial and/or resentencing.

3        On February 20, 2009, Petitioner filed a second petition for review in the California

4    Supreme Court. (Lodged Doc. No. 10.) The Court denied review on March 25, 2009. (Lodged

5    Doc. No. 11.)

6        Petitioner filed the instant federal petition for writ of habeas corpus on March 19, 2009.

7    (Court Doc. 1.) Respondent filed an answer to the petition on June 23, 2009. Petitioner did not

8    file a traverse. (Court Doc. 16.)

9                          STATEMENT OF FACTS[2]

10       On the morning of February 25, 2006, Correctional Officers Daniel Fierro
     and Luis Urena were collecting breakfast trays from the inmates at Corcoran State
11   Prison. The officers went to each cell with a plastic cart, and unlocked and opened
     the food port in the center of the cell door. The inmate placed the tray through the
12   port, the officer retrieved the tray, placed it on the cart, closed and locked the port,
     and then moved on to the next cell. The officers were wearing face shields which
13   went down to their chins, along with latex gloves and stab-resistant vests, and
     were armed with pepper spray. The officers wore such attire as it was common for
14   the inmates to throw things at them, such as urine, blood or feces, a practice
     known as "gassing."
15
         The process of opening and closing the food ports was noisy so that the
16   inmates knew the officers were collecting the trays, and they were usually ready to
     hand over the trays. The food port was about waist-high. When the food port was
17   closed and locked, there was still about a one-quarter inch gap between the door
     and the frame. Officer Urena testified an inmate would occasionally refuse to
18   return his tray. In such a situation, the officers would call a supervisor, who would
     ask for the tray. If the inmate again refused, the supervisor would put together an
19   extraction team, which usually encouraged the inmate to comply with the order.

20       Officers Fierro and Urena retrieved the tray from the inmate in cell 12, and
     were about to turn their attention to the adjoining cell 11, where appellant was the
21   sole occupant. Appellant had been in that cell for a few days and the officers did
     not have any prior problems with him. As the officers locked the food port on cell
22   12, a liquid substance was thrown out of cell 11 and hit Officer Fierro on the left
     side of his face and went under his protective mask. Fierro was still facing cell 12
23   so that the left side of his body was against the door of cell 11. Fierro had been
     looking at the inmate in cell 12 when he was hit by the liquid, and that inmate had
24   been standing in the back of his cell and had not thrown anything at him.

25       After he was hit by the liquid, Fierro looked into cell 11 and saw appellant
     standing by the door and holding his state-issued cup. There was liquid dripping
26   from the food port and the cell door. Fierro turned away from cell 11 and alerted

27   ───────────────────────

28       [2] The Court finds the Court of Appeal correctly summarized the facts in its March 27, 2008 opinion. Thus,
     the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

Urena that he had been gassed.

Officer Urena testified he was standing in front of cell 12 and facing cell 11, and saw the liquid "fly out" of cell 11's perforated door and hit Fierro. Urena testified the food trays were piled on the cart, but the trays did not obstruct his view of the cell door. Urena believed the liquid had been thrown in an "upward" trajectory in order to hit Fierro under the face mask.

Officer Urena testified he immediately moved Fierro out of the way and ordered appellant to place his back to the food port and submit to mechanical restraints. Appellant started to back up to the door but then picked up the cup, reached into the toilet with the cup, stood up, and started to turn toward the door. Urena believed appellant was being aggressive and about to "gas" him, and sprayed appellant with pepper spray. Appellant dropped the cup and ran to the back of the cell.

Officer Fierro immediately went for medical treatment. The liquid quickly dried and was not swabbed or tested. Officer Fierro testified that he did not smell any odor from the liquid and thought it could have been water, but he was not sure and the exact nature of the liquid was never determined.

The prosecution introduced appellant's section 969b packet into evidence, which contained appellant's custodial history and abstracts of judgment showing that appellant was convicted of assault with a deadly weapon and intent to inflict great bodily injury in 1989 (§ 245, subd. (a)(1)), burglary in 1990 (§ 459), murder and attempted murder in 1997, and battery on a peace officer in 1999 (§ 243, subd. (c)).

**Defense Evidence**

Appellant testified that he had been at Corcoran for two days and did not have any prior problems with Officers Fierro and Urena. Based on the location of his cell, he was the first person to receive his food tray and the last to have his tray collected. On the morning of February 25, 2006, he did not eat his breakfast. Appellant testified he was concerned about the food because it made him sick the previous morning, "and it was a pattern of this type of thing." He could hear the officers collecting the tray from the adjoining cell. He sat on his bunk and told Officer Fierro that he was "holding the tray hostage," which meant that he refused to relinquish his food tray. Appellant testified he told the officers, " 'You're not getting this tray. Get it yourself,' " and asked to speak to a supervisor about the food.

Appellant testified that Officer Urena stepped around Officer Fierro, and Urena sprayed pepper spray directly at him. Appellant testified he was sitting on his bunk when Urena sprayed him the first time. After Urena used the spray, he ordered appellant to approach the cell door and said, "'Now you get your ass over here.'" Appellant testified he complied with Urena's orders, but Urena sprayed him again in an "improper use of force." Appellant threw down the tray, turned his back, covered up under a blanket, and tried to hide under the bunk.

Appellant disputed the testimony of Officers Fierro and Urena about the incident, and testified the food trays collected on their cart would have been too high for them to see into his cell. Appellant testified he did not throw any liquid out of his cell, he did not scoop any liquid out of the toilet, he did not "gas" anyone, he was sitting on his bunk and "holding [his] food tray hostage" when

Urena used the pepper spray the first time, and he did not approach the cell door until ordered by Urena. Appellant testified Fierro never yelled that he had been gassed, and Urena used the pepper spray because he was mad that appellant refused to return the food tray and demanded to see a supervisor about the food. Appellant testified the officers wrote a "bogus" report about the alleged gassing to cover up Urena's improper use of pepper spray.

In the course of his trial testimony, appellant testified he first went to prison in 1989, he had never remained out of custody for more than five years as an adult, and returned to prison for parole violations. Appellant admitted he had been convicted of burglary, petty theft, and murder, and the murder conviction was pending on appeal.

"Q. And you mentioned you, you've been convicted of a [section] 187?

"A. Yes. I'm serving for it now.

"Q. Homicide?

"A. Yes.

"Q. Which is under appeal, as I understand it. Was that [sic] also an attempted murder in that same case?

"A. Yeah."

On cross-examination, the prosecutor asked appellant if he had ever stricken or attacked an officer, and appellant said yes.

"Q. Have you done that in the past?

"A. Yes, I have.

"Q. Is that there in the prison?

"A. Yes, it is.

"Q. Why would you do something like that?

"A. While they were killing us.

"Q. Is this through your food?

"A. No. This is when they were killing us in '98, '99. I was in the same prison, and it was not these exact same officers, but it was the same prison. The tape murders, the gladiator fights, I was a part of that."

On further cross-examination, appellant reviewed the section 969b packet, conceded he had suffered the prior convictions stated within, and did not dispute any of the convictions listed.

On appeal, appellant contends the trial court improperly denied his requests for continuances so he could defend himself at trial, that defense counsel was prejudicially ineffective for failing to exclude any references to appellant's

prior conviction for battery on a correctional officer, we must reverse the jury's finding that his prior conviction for aggravated assault was a strike, and the jury's true finding on his prior murder conviction as a strike is invalid because it was never read aloud by the clerk of the court.

(Lodged Doc. No. 1, Opinion, at 2-6.)

DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1

2   28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

3   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

4   materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown</u>

5   <u>v. Payton</u>, 544 U.S. 133,  141 (2005) citing <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 405-06

6   (2000).  A state court decision will involve an "unreasonable application of" federal law only if it

7   is "objectively unreasonable." <u>Id.</u>, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>,

8   537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply

9   because that court concludes in its independent judgment that the relevant state-court decision

10  applied clearly established federal law erroneously or incorrectly." <u>Lockyer</u>, at 1175 (citations

11  omitted).  "Rather, that application must be objectively unreasonable." <u>Id.</u> (citations omitted).

12       "Factual determinations by state courts are presumed correct absent clear and convincing

13  evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

14  and based on a factual determination will not be overturned on factual grounds unless objectively

15  unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

16  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

17  apply to findings of historical or pure fact, not mixed questions of fact and law.  <u>See</u> <u>Lambert v.</u>

18  <u>Blodgett</u>, 393 F.3d 943, 976-77 (2004).

19       Courts further review the last reasoned state court opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501

20  U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but

21  provided no reasoned decision, courts conduct "an independent review of the record . . . to

22  determine whether the state court [was objectively unreasonable] in its application of controlling

23  federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

24  independently review the record, we still defer to the state court's ultimate decisions." *Pirtle v.*

25  *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

26  C.       <u>Ineffective Assistance of Trial Counsel</u>

27       Petitioner contends that his trial attorney was ineffective for failing to object to the

28  introduction of his prior conviction for battery on a peace officer.

7

1        1.      *State Court Decision*

2        In rejecting Petitioner's claim, the last reasoned decision of the Court of Appeal held, in

3   pertinent part:

4              While [Petitioner] was represented by counsel, he still elected to testify on
           his behalf and was subject to impeachment with his prior felony convictions.
5          [Petitioner] contends defense counsel was prejudicially ineffective because he
           failed to object to the prosecutor's references to his prior conviction for battery on
6          a peace officer, and the admission of that prior conviction was prejudicial because
           it was similar to the charged offense.
7
8              ......................................................................................................

9              Evidence that a defendant committed misconduct other than that currently
           charged is inadmissible to prove that he has a bad character or a disposition to
10         commit the charged crime.  (Evid. Code § 1101, subds. (a), (b); *People v. Kipp*
           (1998) 18 Cal.4th 349, 369.)  However, evidence of a defendant's prior conviction
11         is admissible to impeach a testifying defendant where the prior offense was a
           crime of moral turpitude, because such an offense demonstrates a general
12         "readiness to do evil' from which a willingness to lie can be inferred.  (*People v.
           Castro* (1985) 38 Cal.3d 301, 314-315; *People v. Wheeler* (1992) 4 Cal.4th 284,
13         289, 295-296; *People v. Harris* (2005) 209 Cal.App.3d 839, 857.)

14             The instant record is silent as to counsel's reasons for failing to object to
           the prosecutor's cross-examination questions about [Petitioner's] prior conviction
15         for battery on a peace officer.  There is, however, one satisfactory explanation: the
           evidence was admissible and objection would have been futile, such that counsel's
16         failure to object was not ineffective.  (*People v. Price* (1991) 1 Cal.4th 324, 386-
           387; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.)  The offense of
17         felony battery on a peace officer, in violation of section 243, subdivision (c), is an
           offense of moral turpitude and may be used to impeach a testifying defendant.
18         (*People v. Lindsay* (1989) 209 Cal.App.3d 839, 857.)

19             "Battery upon a peace officer involves elements in addition to
               those necessary for a conviction for simple battery, or battery
20             which causes serious injury: the willful and unlawful use of force
               must be: (1) upon a peace officer in the performance of his or her
21             duties; and (2) the person committing the battery must know or
               reasonably should have known the victim of the battery was a
22             peace officer . . . . [¶] The knowledge element of the crime of
               battery upon a peace officer (that defendant know or reasonably
23             should have known the victim was a peace officer in the
               performance of his duties) clearly involves moral turpitude.  There
24             is no doubt the intentional, willful and unlawful use of force upon a
               peace officer, however slight, coupled with actual knowledge the
25             victim is a peace officer in the performance of his or her duties, is
               clearly a crime of moral turpitude and demonstrates a readiness to
26             do evil."  (*People v. Lindsay*, *supra*, 209 Cal.App.3d at p. 857; see
           also *People v. Clarida* (1987) 197 Cal.App.3d 547, 552; *People v.
27         Marks* (2003) 31 Cal.4th 197, 238 (conc. Opn. of Chin, J.).)

28             The prosecution herein was thus entitled to impeach the credibility of
           [Petitioner's] trial testimony with evidence that he had suffered a prior felony

1   conviction involving moral turpitude.  In addition, the jury was properly instructed
2   pursuant to CALCRIM No. 316 as to the consideration of appellant's prior
    convictions.

3   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

4   Appellant complains the prosecutor improperly cited to the prior battery
    conviction in closing argument to assert that he had a bad character and propensity
5   to commit the charged offense.  In his closing argument, however, the prosecutor
    focused on the credibility issues between the two correctional officers and
6   appellant, asserted appellant was the only person who had a bias, and argued
    appellant's prior felony convictions undermined the credibility of his trial
7   testimony.  The prosecutor cited the evidence which supported the prior
    conviction allegations, and again reminded the jury to consider his prior
8   convictions when assessing appellant's credibility.  "Once again, [appellant] got
    on the stand and told you he's assaulted officers in the past.  That's not a surprise
9   that he said that.  There's nothing to believe he did not do it on this day just like
    the officers told you."

10  In *People v. Hinton* (2006) 37 Cal.4th 839, the court held that the
11  prosecutor's closing argument references to a capital defendant's prior convictions
    for murder and other violent crimes were not improper attacks upon the
12  defendant's character, but instead a permissible attack on the defendant's
    credibility and rebuttal of his defense claim, and the argument was not error since
13  the jury was properly instructed on the appropriate consideration of the prior
    convictions to impeach the defendant's credibility.  (*Id.* at p. 870.)

14
15  The instant trial presented a fairly straightforward question to the jury to
    evaluate the credibility of Officers Fierro and Urena, that appellant threw a liquid
16  substance at Officer Fierro, against appellant's testimony that he did not throw
    anything at Officer Fierro, Officer Urena improperly used pepper spray to punish
17  him for holding back his breakfast tray, and the officers fabricated the allegations
    in this case to cover up their improper use of pepper spray.  As in *People v.
18  Hinton*, *supra*, 37 Cal.4th 830, 870, the entirety of the record reflects the
    prosecutor relied upon appellant's prior convictions to impeach his credibility, the
19  jury was properly instructed on the issue, and defense counsel was not
    prejudicially ineffective for failing to object.

20  (Lodged Doc. No. 1, Opinion, at 26-30.)

21      2.    *Applicable Law*

22  The law governing ineffective assistance of counsel claims is clearly established for the

23  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

24  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

25  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

26  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

27  the petitioner must show that counsel's performance was deficient, requiring a showing that

28  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

9

1   the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

2   representation fell below an objective standard of reasonableness, and must identify counsel's

3   alleged acts or omissions that were not the result of reasonable professional judgment

4   considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

5   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

6   a strong presumption that counsel's conduct falls within the wide range of reasonable

7   professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

8   Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

9       Second, the petitioner must show that counsel's errors were so egregious as to deprive

10   defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

11   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

12   ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

13   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

14   was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

15   (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

16   have been different.

17       A court need not determine whether counsel's performance was deficient before

18   examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

19   Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

20   prejudice, any deficiency that does not result in prejudice must necessarily fail.

21       Ineffective assistance of counsel claims are analyzed under the "unreasonable

22   application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

23   1058, 1062 (2000).

24       3.   *Analysis*

25       As fully explained by the Court of Appeal, Petitioner's prior conviction for battery on a

26   peace officer was admissible under California law to impeach his credibility.  There can only be

27   habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair

28   and resulted in a denial of due process.  Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v.

10

1  Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993);

2  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990).  Only if there are no permissible inferences

3  that the jury may draw from the evidence can its admission rise to the level of a due process

4  violation.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

5        In this case, the admission of Petitioner's prior conviction for battery on a peace officer

6  did not violate due process.  It is clear under California law that an intentional battery on a

7  known peace officer during the performance of his duties involves moral turpitude and

8  demonstrates a propensity toward a readiness to do evil.  Evidence of other crimes is admissible

9  in California if it tends to demonstrate guilty knowledge, motive, intent or the presence of a

10  common design or plan.  Evid. Code § 1101(b).  Such evidence was admissible to impeach the

11  credibility of Petitioner's trial testimony that he did not commit the instant battery on a peace

12  officer.  See e.g. United States v. Givens, 767 F.2d 574, 580 (9th Cir. 1985) (held that the

13  impeachment value of a similar prior conviction outeweighed its prejudicial effect because the

14  defendant's "proposed testimony, in which he would have denied committing the offense, would

15  have placed his credibility directly at issue."); see also United States v. Cook, 772 F.2d 482, 487-

16  488 (9th Cir. 1985) (evidence of similar prior conviction is admissible if the defendant

17  misrepresents his character to the jury).  Petitioner placed his credibility at issue by denying that

18  he committed a battery upon a peace officer, and the fact that he previously committed a battery

19  on a peace officer was directly relevant to test his veracity.  In addition, the trial court instructed

20  the jury that it could consider the prior convictions in determining Petitioner's credibility, not to

21  establish his guilt.  (See RT 492.)  Thus, Petitioner's claim that trial counsel was ineffective for

22  failing to object to the admission of such evidence is without merit as such evidence was

23  unquestionably admissible under California law.  The state courts' determination of this issue

24  was not contrary to or an unreasonable application of Strickland.

25  ///

26  ///

27  ///

28

1    D.    Instructional Error

2          Petitioner contends that the jury's true finding on his prior murder conviction must be

3    reversed because it was not read aloud in open court and acknowledged by the jury.[3]

4          Respondent correctly points out that the instant claim is not cognizable in a federal

5    habeas action because the claim only implicates a violation of state law.  The Constitution does

6    not require unanimity in a jury verdict.  Johnson v. Louisiana, 406 U.S. 356, 359 (1972);

7    Apodaca v. Oregon, 404 U.S. 406, 410-413 (1972); Schad v. Arizona, 501 U.S. 624, 634, n.5

8    (1991).  Petitioner's claim is based on sections 1149 and 1164, which requires that the jury's

9    verdict be declared in open court and acknowledged by the jury.  These statutes serve to protect

10   California's constitutional requirement of jury unanimity in criminal cases.  See People v.

11   Thornton, 155 Cal.App.3d 845, 858-859 (1984).  Thus, although Petitioner may have had a right

12   to a unanimous verdict under California law, Petitioner cannot demonstrate a violation of the

13   federal Constitution.

14         In any event, Petitioner's claim is factually flawed.  The California Court of Appeal, after

15   remand, found that the jury's finding was properly read aloud in open court and acknowledged by

16   the jury.  (Lodged Doc. No. 9.)  This factual finding was supported by the reporter's corrected

17   transcript and the recollection of Petitioner's trial counsel.  Petitioner has failed to provide any

18   evidence that would call into doubt the correctness of this factual finding.  28 U.S.C. §

19   2254(e)(1).   Accordingly, Petitioner's claim fails on the merits.

20   E.    Insufficient Evidence to Support Prior Aggravated Assault Conviction

21         Petitioner claims there was insufficient evidence to support the finding that his prior

22   aggravated assault conviction was a "strike" under California's Three Strikes law.  Petitioner

23   raised this argument on direct appeal, and the California Court of Appeal found this claim had

24   _____

25        [3] Respondent points out that this claim is unexhausted because it was not presented to the California
     Supreme Court in his petition for review.  Respondent is correct.  (See Lodged Doc. No. 21, Petition for Review.)
26   Notwithstanding Petitioner's failure to exhaust this claim, it is clear the claim fails on the merits.  See 28 U.S.C. §
     2254(b)(2); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court may deny an unexhausted petition
27   on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.).

28

merit and reversed the finding that his prior aggravated assault conviction was a "strike."

Therefore, Petitioner is not entitled to further relief by this Court.

F.     Denial of Right to Self-Representation and Due Process

Petitioner argues that he was denied his rights to self-representation and due process when the trial court denied his request for a continuance of the trial so he could prepare his defense.

    1.     *State Court Decision*

The California Court of Appeal thoroughly summarized the lengthy background of this claim and stated in pertinent part the following:

> . . . Prior to the preliminary hearing, the court granted [Petitioner's] request to represent himself and appointed Rex Payne as [Petitioner's] standby counsel.  On August 17, 2006, the preliminary hearing was held, and [Petitioner] represented himself.
>
> On August 29, 2006, the information was filed. On August 30, 2006, appellant filed a motion for ancillary funds and services and declared he needed additional assistance to represent himself because he was in the SHU. Appellant further declared that he had a prescription for eyeglasses but it was not filled; the fluorescent lights in his cell were insufficient to read materials to prepare for trial; and the postage and stationary supplies he received pursuant to California Department of Corrections (CDC) policies were insufficient to prepare for trial, and he needed additional postage, writing instruments, file folders, and other materials beyond that permitted by CDC policies in order to represent himself.
>
> Appellant also filed a lengthy motion for "protection" and requested the court order CDC to provide him with additional library services beyond those provided to inmates in the SHU. Appellant requested the court order an investigation into his allegations that the correctional officers at Corcoran were subjecting him to "an on-going pattern" of physical assaults and harassment and interfering with his right to represent himself. In the course of his "protection" motion, appellant declared he needed investigative services to support his defense that "his battery" on Officer Fierro "was justifiable self-defense" because Fierro was acting in concert with the warden and other officers to taint appellant's food with "pain-inducing chemical agents." Appellant further asserted that when he was housed in the state prison in Sacramento, various CDC officials conspired with prison gang members to kill appellant because of his "history of battery on corrections officers," his prison activism and lawsuits, and his knowledge that various CDC officials were involved in murders and physical assaults. Appellant asserted his food was tainted at both the Sacramento and Corcoran prisons as part of this conspiracy, and he suffered numerous physical symptoms that were not properly treated. Appellant's "protection" motion further asserted inmate Jimmie Harmon and investigator Ken Lazzarini were involved in a case in Amador County, and they could support the "justification of my battery" on Officer Fierro because they knew of CDC's "long-standing practice" to contract prison gang members to kill inmates. He also named other inmates who allegedly had their food tainted by CDC officials.

Based on all these allegations, appellant moved for an order of protection and preliminary injunction for an outside medical evaluation, and for CDC officials to provide him with various stationary supplies and telephone privileges beyond those permitted by CDC regulations for SHU inmates in order to represent himself.

**B.      The Arraignment and Appellant's Further Motions**

On August 30, 2006, Judge Bissig presided over the arraignment. Appellant requested to represent himself pursuant to *Faretta,* and the court granted his motion. In doing so, the court admonished appellant that the right of self-representation did not entitle him to any special privileges.

"... You are a confined inmate, and as such are obviously at somewhat of a disadvantage in terms of access to the various resources that an attorney might have available to him or her. Those problems are problems that you are taking on yourself and the Court is not going to fix those problems for you."

The court stated it would not issue any orders to alter appellant's conditions of confinement without a noticed hearing in which CDC was a party. The court further stated that the right of self-representation was conditioned upon orderly behavior and would be withdrawn if he was disruptive, and standby counsel to be available to take over the case.

The court advised appellant the prosecutor was a highly skilled and highly trained professional, appellant would be at a disadvantage, and appellant would have to abide by the same rules as to the filing of documents and motions.

"... You're not going to receive any special privileges from the Court because of your pro per status. You're going to be expected to know the technical rules of substantive law and criminal procedure and evidence. You're going to have to comply with notice requirements on all motions that you file in the same manner as would be expected of a private or a court-appointed attorney. And if you have physical limitations or other limitations that prevent you from acting as your own attorney, you may not be able to proceed in that capacity. You will receive no special library privileges or extra time for preparation and will have no staff or investigators at your beck and call."

Appellant stated that the previous month, another judge already granted a motion for appointment of an investigator, and complained he had not seen the investigator, Mr. Vela. The court replied it had not seen any such motion or order for appointment of an investigator.[4] The court advised appellant that he had to comply with the requisite procedures and submit a declaration showing good cause for the appointment of an investigator so that the court could "make a determination as to whether it is reasonable and appropriate to cause those expenses to be incurred. But it's a case-by-case determination. It's not an automatic thing."

.......................................................................................................

---

[4] The instant record does not contain any order appointing an investigator.

## C.    Pretrial Motions and Hearings

On September 13, 2006, Judge LaPorte conducted the pretrial conference. Appellant complained that he was having trouble with his standby counsel, Mr. Payne. The court relieved Mr. Payne and appointed Brian Gupton as standby counsel. Appellant then requested to continue the trial because he was not prepared and had not talked to Mr. Velo, the investigator. Appellant stated that on July 27, 2006, Judge DeSantos appointed Mr. Velo as his investigator. Appellant complained that he did not have a working relationship with Mr. Velo and admitted they had talked about the case but Mr. Velo refused to interview the 20 witnesses on his list.

Mr. Velo was present and advised the court that he had not received sufficient funds to interview the 20 witnesses on appellant's list because these witnesses were inmates who had been transferred to other prisons around the state. Mr. Velo was willing to conduct the investigation if sufficient funds were allocated.

The court advised appellant:

"[¶] ... [Y]ou will need to identify for the Court, in terms of being able to approve the investigation, how these witnesses are connected with this particular alleged offense. Do you know what I'm saying?

"[Appellant]: Yes, sir.

"The Court: So there has to be some connection between the witnesses you're going to call and the offense. You'll need to identify for that so that I can then make sure that the amount of money that's available for Mr. Velo to interview those things, for the people who are going to be testifying in this case as opposed to for some other reason. Now, do you understand what I'm saying?

"[Appellant:] Yes."

Mr. Velo advised the court that he believed the witnesses on appellant's list had nothing to do with the charged offense. The court replied that appellant was going to tender a motion to show how these witnesses were connected with the case. Appellant replied that he already had such a document and presented it to the court. Mr. Velo advised the court that he had personal issues which would conflict with the scheduled trial. The court relieved Mr. Velo and would consider appellant's motion. Appellant requested appointment of a process server and complained that his subpoenas were not being served. The court replied that it would not instruct the sheriff and appellant needed to file a separate motion.

On September 19, 2006, Judge Atkinson conducted a hearing on appellant's pending motions. Appellant complained he was not receiving sufficient time in the prison law library to prepare. Appellant also complained he suffered from various physical disabilities and ailments, and asserted that CDC officials were contaminating his food in retaliation for the "allegations that were relevant to this immediate case." The court asked about his current ability to represent himself, and appellant said, "I'm representing myself just fine." Appellant also complained he had not been able to serve any subpoenas. The court turned to the investigator issue, and advised appellant that it needed a list of witnesses he wanted to subpoena and why they were relevant to the proceedings.

On October 2, 2006, the court filed an order which granted appellant's pending motion to relieve Mr. Velo from serving as his investigator "insofar as he does not want services" from Mr. Velo. The court denied appellant's motions for ancillary funds and appointment of a registered process server because appellant failed to state facts establishing good cause for the specific services.

On October 4, 2006, Judge Atkinson convened the trial readiness hearing. Appellant requested to vacate the trial date for at least 60 days because he was not prepared, his subpoenas had not been served, and he had not met with the new investigator appointed by Judge LaPorte.

The court replied that Judge LaPorte did not appoint another investigator because appellant had not shown good cause or a specific reason why an investigator was needed for specific services. The court advised appellant that his previous motions were denied on October 2, 2006, and appellant said he never received the order. The court provided appellant with a copy of the order, and appellant objected to the court's denial of the motions.

Appellant presented the court with additional motions for transcripts, appointment of Kenneth Lazzarini as the investigator, reasonable accommodations, and objections to the alleged obstruction of his case, and requested an immediate hearing on the motions. The court declined to hear the motions because appellant failed to properly notice and serve the prosecutor. Appellant complained he did not have sufficient time in the prison law library.

The court decided to continue the readiness hearing for a few days so appellant could properly serve his motions on the prosecutor. The court also explained why it denied his motions for ancillary funds and an investigator:

"... You have not to date provided the Court with any facts, specific facts, justifying the expenditure of funds for any specific services that are relevant to any legally admissible evidence or leading to the same for any defense of the charge that you're facing. Maybe you've done it in your new motions, I'll examine them and I'll rule on them. But based upon what you've submitted, it's clear to me that you don't understand what you're doing, you don't know how to ask for what you need properly, and I'm afraid you won't know what to do at trial with any evidence if you get it and the Court will be required to exclude it if you don't try to introduce it properly. You know, you really need an attorney to do this."

Appellant said the court already appointed Mr. Velo as his investigator. The court replied that appellant did not want him. Appellant agreed but thought the court already found good cause for appointment of an investigator but just discharged Mr. Velo since he wanted more money, and "all of a sudden I need to submit new and improved grounds for an investigator."

The court explained appellant was not entitled to an investigator and he had to show why he needed one. "It has to be relevant, it has to be properly expended funds, and you haven't done it right. I'm really unimpressed with the quality of your legal work frankly and you're going to be at a terrible, terrible disadvantage at trial because you don't understand what you're doing." The court advised appellant to accept appointed counsel. Appellant refused and said he would "deal with this on appeal." The court replied that "all your mistakes are something you cannot appeal," because he could not raise his own incompetency as his own attorney. Appellant declared that he was not incompetent, but that he had been obstructed from representing himself. The court explained it was just

requiring him to follow the same rules required of any other attorney. Appellant asked how to file an interlocutory appeal, and the court declined to give him any legal advice.

On October 6, 2006, Judge Atkinson convened the continued readiness hearing and placed on the record that appellant had been transported to the hospital. An officer stated appellant appeared normal during transportation and had been placed in a holding cell, but went into a fetal position and was incoherent and unable to answer any questions. The court noted it had previously denied appellant's motion for a continuance, was concerned whether appellant was trying to disrupt the proceedings, continued the readiness hearing for a few days, but kept the same trial date.

The record contains the discharge report from the hospital's emergency room, which states that appellant suffered a nondiabetic hypoglycemic reaction and had an episode of nondiabetic low blood sugar, which could have been caused by eating highly refined carbohydrates, drinking too much alcohol, intense exercise, fatigue, stress, and/or poor diet. He was treated and released the same day.

On October 10, 2006, appellant filed a "written list of objections to the ongoing pattern of obstruction of the judicial process." Appellant asserted the court, the public defender, and the investigator obstructed his ability to present his defense that CDC officials conspired to murder inmates. Appellant stated that he filed a civil rights lawsuit against CDC in 2003, [sic] gang members at the Sacramento prison attempted to kill him in 2004, CDC officials intentionally housed him with gang members at that time to facilitate the attempts on his life, and his food was poisoned. Appellant asserted he was transferred to Corcoran in 2006 to prevent him from revealing information about the conditions in Sacramento, and the Corcoran officers also tainted his food. Appellant declared Officer Fierro lied about the alleged battery in this case to cover up the issue of the poisoned food and the contract on his life.

Appellant complained that he advised his previous standby counsel, Mr. Payne, about the conspiracy to kill him but Mr. Payne had not done anything. Appellant also complained that he had not been able to develop his defense, which included evidence of CDC's conspiracy to kill him and its attempts to suppress internal investigations. Appellant declared he needed an investigator to help him prepare for the "preliminary hearing."

Also on October 10, 2006, appellant filed a motion to vacate the scheduled trial date of October 24, 2006, and for a 90-day continuance. Appellant restated his allegations that there was a conspiracy among CDC officials to kill him, the conspiracy was the result of a civil rights lawsuit he filed when he uncovered a massive conspiracy to attack and kill inmates in the Sacramento prison, the warden of the Sacramento prison contracted prison gang members to kill him, his food was regularly poisoned, and Officer Fierro was part of this conspiracy and fabricated the charges against him. Appellant complained his previous standby counsel, Mr. Payne, failed to pursue any investigation of these issues, and the court failed to appoint another investigator to help him. Appellant alleged the trial court denied his previous motion for a protective order because it was part of the conspiracy against him. Appellant asserted he should receive a continuance to investigate these issues and prepare for trial.

Appellant filed a separate motion for appointment of Kenneth Lazzarini as

his investigator because he already investigated these issues in the case of another inmate, Jimmie Harmon, and he was familiar with CDC's conspiracies against inmates. Appellant also filed a motion for appointment of a process server and for an unrestricted order for a process server to handle any matters appellant might need.

On October 10, 2006, Judge Atkinson convened the continued readiness hearing, and considered and denied appellant's pending motions for protection and for a hearing to consider whether he had been obstructed from access to the court. The court also denied appellant's pending motion for appointment of Kenneth Lazzarini as his private investigator because he failed to show good cause. The court also denied his motion to continue the trial. The court noted appellant's motions for a continuance, an investigator, and the alleged obstruction of his access to the judicial process, were all tied together to his complaints that he needed more time to prepare.

"And [appellant] is requesting a lot of the information to prepare for trial with the anticipation that he's going to be presenting as a defense to these charges witnesses and information that, as he stated, took place at other institutions, at other times, well preceding the charge in which he's facing, and the information that he wants to present to the Court is not a legal defense to the charge, it would be a waste of time and money for the Court to appoint investigators, issue subpoenas, have the witnesses transported, all of that is a waste because it does not produce any relevant admissible evidence that would constitute a defense to the charge in which he's-[sic] in which he's facing.

"It might be of interest, it might be relevant to some other legal proceeding, but not to this charge. And based upon that those motions have been denied and that also negates the reason to continue the trial beyond its currently set date. So it would be a lack of any other showing, the Court will summon a panel for the trial on the currently set trial date."

On October 19, 2006, appellant filed another motion to continue the trial for at least 60 days, and again set forth his allegations that CDC officials conspired to attack and kill him, and the conspiracy was the result of a civil rights action he filed in an unrelated matter. Appellant further asserted that he became ill at the courthouse because he ate his entire breakfast that morning, the hospital verified his assertions that he was poisoned, and he was not physically ready for trial. Appellant declared he needed a continuance because the trial would conflict with the administrative schedule of his federal civil rights lawsuit, he needed more time to investigate the regular practice of CDC's officers to fabricate charges against inmates to cover up their own misconduct, and his investigation would also show the warden of the Sacramento prison conspired to kill him.

On October 24, 2006, appellant filed a petition for writ of mandate for the court to grant a continuance, and again set forth the reasons previously alleged in his earlier motions.

On October 24, 2006, Judge Atkinson conducted the trial confirmation hearing. The prosecutor moved to dismiss one of the four alleged prior strike convictions because of an absence of proof, and the court granted the motion. The court turned to appellant's pending motion for a continuance. The court asked if appellant was doing okay. Appellant said he was not feeling well, he was "under attack" at the prison, his food was being tampered with, and that was why he passed out in the holding cell and was taken to the hospital. Appellant declared

18

the emergency room physician "concurred that I was suffering a reaction to toxins in my system." Appellant said he was still unable to prepare for trial and had no control over his preparation time in prison.

The court noted appellant appeared capable of expressing himself at all hearings, and it saw no change in circumstances to support granting the continuance. Appellant said he had another deadline in an unrelated case before the Ninth Circuit Court of Appeals, and he had insufficient time in the prison law library. The court stated appellant's continuance motion involved witnesses and incidents arising from an unrelated case in Sacramento which had nothing to do with the pending criminal charge, that appellant failed to state any legal cause for a continuance, and the trial remained set to begin the next day.

**D. First Day of Trial**

On October 25, 2006, Judge Atkinson convened the first day of trial. Appellant objected to the court's denial of his continuance motion and complained he did not have sufficient time to use the prison law library. Appellant introduced the emergency room report about the day he collapsed in the holding cell, and asserted the report "bares out" his allegations against CDC. He was still having headaches, he was not feeling well, and he was not ready to proceed.

However, appellant also presented the court an application for appointment of counsel and asked if his standby attorney, Mr. Gupton, could represent him for trial "because I'm not being allowed to." Appellant stated his defense had been "castrated," he was in pain, he did not have any witnesses, subpoenas had not been served, and he did not have any defense funds. The court asked appellant if he wanted Mr. Gupton to represent him at trial, and appellant said yes. The court asked Mr. Gupton if he was ready to proceed, and Mr. Gupton replied he was. The court appointed Mr. Gupton, granted a brief recess for appellant to speak with Mr. Gupton, and then proceeded with trial. Mr. Gupton represented appellant throughout the entirety of the trial and appellant did not raise any objections to his representation.

(Lodged Doc. No. 1, Opinion, at 7-18.)

After setting forth the applicable law, the Court of Appeal found the claim to be without

merit stating:

In the instant case, appellant asserts he timely requested continuances to prepare for trial, and the court's denial of his continuances interfered with his Sixth Amendment right to represent himself. However, appellant never asserted he was denied access to a law library or any of the other factors addressed in *Milton.* Instead, appellant demanded additional access to the law library, stationary supplies, and support services beyond those provided to an inmate in the SHU. The record herein reflects "no confusion on [appellant's] part regarding the meaning of the [ *Faretta* ] admonitions, risks of self-representation, or the complexities of his case...." ( *People v. Lawley* (2002) 27 Cal.4th 102, 142.) Indeed, the court herein specifically advised appellant that he would not receive any special accommodations as a confined inmate. ( *Hayes, supra,* 231 F.3d at pp. 1138-1139 & fn. 4.) The record demonstrates that appellant was in the SHU when he asserted his *Faretta* rights and throughout the entirety of this case, and there are no allegations that he was placed in administrative segregation simply as a result of his assertion of his right to represent himself. (See, e.g., *Wilson v.*

19

*Superior Court, supra,* 21 Cal.3d at p. 826.) Appellant was already subject to limitations on his privileges when he elected to represent himself, he was clearly advised that he was not entitled to special privileges, and his continuance requests were properly denied.

Appellant further asserts a continuance should have been granted because he was physically incapable of representing himself, and the hospital's emergency room report confirmed his allegations that he was being poisoned. However, the emergency room report stated he suffered a nondiabetic hypoglycemic reaction which could have been caused by eating highly refined carbohydrates, intense exercise, fatigue, stress, and/or poor diet. The report did not speculate that appellant's problem was caused by contaminated or poisoned food. The trial court specifically rejected this claim and noted appellant appeared healthy and capable of representing himself, and there is nothing in the record to refute the court's finding.

More importantly, however, the entirety of the record reflects that appellant's requests for continuances were entirely based on allegations about unrelated events at the Sacramento prison, which were apparently part of a pending civil rights lawsuit in federal court. Appellant never asserted that he needed more time to prepare his defense in order to track down inmates or officers who might have been witnesses to the events of the morning of February 25, 2006. Instead, appellant demanded unlimited investigative and subpoena services to look into his assertions about alleged activities of CDC officials in the Sacramento prison. Appellant attempted to tie these requests to the instant case, but the trial court properly found his requests for continuances were based on extraneous matters not related to the instant charge. Indeed, appellant essentially wanted the court to provide the financing for a "fishing expedition" apparently connected to his pending civil rights lawsuit. The court repeatedly advised appellant to file a motion setting forth good cause for appointment of an investigator to pursue his lengthy witness list, and why an investigator would help defend the criminal charge in this case. Appellant attempted to tie these disparate issues together, and even asserted that matters in Sacramento must be investigated to provide a defense to his "battery" of Officer Fierro, but his numerous motions repeatedly relied on his allegations about the events at the Sacramento prison and did not address the specific issues raised by the criminal charge in this case.

As in *Jackson,* appellant had ample time to prepare to represent himself in this case, and his advisory counsel provided an adequate alternative. (Cf. *Milton, supra,* 767 F.2d at pp. 1446-1447; *United States v. Wilson, supra,* 690 F.2d at p. 1272; *Jenkins, supra,* 22 Cal.4th at pp. 1001, 1040.)  The court did not abuse its discretion when it denied appellant's continuance motions, and these denials did not violate his Sixth Amendment right to represent himself.

(Lodged Doc. No. 1, Opinion, at 24-26.)

2.    *Applicable Law*

A denial of a continuance amounts to a constitutional violation "only if there is an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Morris v. Slappy, 461 U.S. 1, 11-12 (1983); see also Houston v. Schomig, 533 F.3d 1076, 1079-1080 (9th Cir. 2008).  "[B]road discretion must be granted trial courts on matters of

continuances." <u>Slappy</u>. at 11.

> There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

<u>Ungar v. Sarafite</u>, 376 U.S. 575, 589 (1969).

> 3.   *Analysis*

The trial court reasonably exercised its discretion in denying Petitioner's request for a continuance. The Court of Appeal thoroughly analyzed the trial court's reasoning that rationally and persuasively support the denial of Petitioner's request for a continuance. Indeed, there is little analysis this Court can add to the appellate court's decision. In sum, Petitioner was fully informed and aware of the risks involved in representing himself, including no special privileges, no alteration of the conditions of his confinement, knowledge of the law and legal process as it relates to filing documents and motions, and his self-representation was dependent upon his orderly behavior. Despite these admonishments, Petitioner continued to request for self-representation, and his request was granted and stand-by counsel was appointed. The court set a jury trial of October 25, 2006-which was nearly two months later. (Lodged Doc. No. 12, RT 1-11.) Later, at the October 4, 2006, hearing, the judge told Petitioner "I'm really unimpressed with the quality of your legal work frankly and you're going to be at a terrible, terrible disadvantage at trial because you don't understand what you're doing." (RT 160.) He was advised to accept the appointment of counsel. As the trial date neared, Petitioner filed several motions requesting the trial date be vacated and the matter be continued. Petitioner's request was based on his perceived inability to investigate and gather information to support his defense that CDC officials were conspiring to kill him and Officer Fierro was part of the conspiracy. The Court denied Petitioner's request for a continuance because the information he sought was simply not relevant to a cognizable legal defense to the charged offense. (RT 251-254, 301-310.)

With regard to the appointment of an investigator, the trial court repeatedly informed Petitioner that he was required to file a motion setting forth the factual basis to justify the

expenditure of funds for services that are relevant to admissible evidence or relate to a cognizable legal defense.  The Court denied Petitioner's numerous requests for an investigator and process server because the information he sought was not relevant to any cognizable legal defense.  The trial proceeded as scheduled on October 25, 2006, and Petitioner yielded to having stand-by counsel represent him at trial.  (RT 400-404.)

It is clear from review of the record that the trial court properly exercised its discretion in denying Petitioner a continuance.  Not only was Petitioner provided ample time to prepare for trial (nearly two months), he failed to demonstrate a justifiable reason for the delay.  As stated by the Court of Appeal, Petitioner's motions "did not address specific issues raised by the criminal charge in this case," and Petitioner "essentially wanted the court to provide financing for a 'fishing expedition' apparently connected to his pending civil rights lawsuit."  (Lodged Doc. No. 1, Opinion, at 26.)

Moreover, even assuming the trial court abused its discretion, Petitioner has not demonstrated any resulting prejudice.  See e.g. Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1977); see also Fry v. Pliler, 551 U.S. 112, 121-122 (2007); California v. Roy, 519 U.S. 2, 5 (1996); Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  In light of the evidence in support of the trial court's decision, the denial of a continuance did not deprive Petitioner of the ability to act as his own counsel and put on a legally cognizable defense.  Petitioner's claim is without merit.

<u>RECOMMENDATION</u>

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and,

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to

1   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

2   and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

3   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

4   636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

5   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

6   Cir. 1991).

7

8   IT IS SO ORDERED.

9   **Dated:    November 17, 2009          /s/ Sandra M. Snyder**
                                        UNITED STATES MAGISTRATE JUDGE